545 A.2d 869

**Robert PHILLIPS, Appellant,**

**v.**

**COMMONWEALTH of Pennsylvania WORKMEN'S COMPENSATION APPEAL BOARD,**

**and**

**Edgar Construction Company,**

**and**

**Esten Lumber Products, Appellees.**

Supreme Court of Pennsylvania.

Argued Dec. 5, 1986.

Decided Aug. 10, 1988.

Reargument Denied Dec. 28, 1988.

Mark B. Weber, Michael D. Kracht, Perkasie, for appellant.

Donald Ewieand, Jr., Thomas A. Wallitsch, Allentown, for Edgar Const. Co.

Curtis C. Creveling, Jr., Allentown, for Esten Lumber Products.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## ORDER

PER CURIAM.

This being an equally divided Court the Order of the Commonwealth Court is affirmed.

HUTCHINSON, Former J., did not participate in the decision of this case.

McDERMOTT, J., files an Opinion in Support of Affirmance in which FLAHERTY and ZAPPALA, JJ., join.

NIX, C.J., files an Opinion in Support of Reversal in which PAPADAKOS, J., joins.

PAPADAKOS, J., files an Opinion in Support of Reversal in which LARSEN, J., joins.

## OPINION IN SUPPORT OF AFFIRMANCE *

McDERMOTT, Justice.

Appellant, Robert Phillips, appeals from an order of the Commonwealth Court affirming an order of the Workmen's Compensation Appeal Board denying his petition to reinstate benefits. The case involves the willful concealment of relevant medical information by a claimant's attorney and

* This case was reassigned to this author.

the effect of such action on a compensation agreement. The germane facts of this case are set out below.

In February, 1977, appellant was employed by appellee, Edgar Construction Company (Edgar), when he allegedly fell from a ladder and injured his back. Despite this fall appellant continued working until July 22, 1977, at which time he was laid off. In May, 1978, appellant filed a workmen's compensation claim, alleging that he was totally disabled due to the February fall. Counsel for Edgar thereupon sought to investigate in preparation for contesting the claim. As part of that investigation defense counsel requested from appellant's counsel all medical records and reports concerning appellant's injuries.

In response to that request appellant's counsel supplied medical information which was favorable to appellant's position, but intentionally omitted a report which indicated that because of a prior back condition it was not possible to relate appellant's present back problem to the fall at work. This report had been prepared by appellant's chiropractor, Dr. Richard Casanova, whom appellant had been seeing for ten years for various ailments. Significantly, not only was the report omitted but the fact that appellant had been under the care of Dr. Casanova was also suppressed.

During the course of these first compensation proceedings appellant presented the testimony of a board certified neurosurgeon, Dr. Robert Jaeger. Dr. Jaeger first saw appellant in January, 1978, approximately eleven months after the fall. At that time appellant's history with Dr. Casanova was not revealed to Dr. Jaeger, nor was the existence of Dr. Casanova's opinion letter.

Based on his examination of appellant, and appellant's oral history, Dr. Jaeger concluded that he had a disabling condition known as facet syndrome, and that this condition was related to his fall. Dr. Jaeger stated his opinion on this matter in an unequivocal manner. Faced with this testimony Edgar eventually decided not to further contest appellant's claim and filed a notice of compensation payable in July, 1979, which acknowledged the existence of appellant's

disability from July, 1977. Two supplemental agreements were also entered into in July, 1979, which provided for varying amounts of compensation payments depending on appellant's other income, and which provided for a suspension of benefits as of July 27, 1979.

The reason for the suspension of benefits, and for the necessity to adjust the compensation amount, was the fact that as of September, 1978, appellant had been working for appellee, Esten Lumber Products (Esten), as a truck driver, a less physically demanding position.

Unfortunately for appellant, Esten experienced a business lull, necessitating the elimination of his job as a driver in February, 1980. Esten, however, offered appellant a manufacturing job, which appellant accepted. This job required a significant amount of bending and lifting, and appellant finally quit the job on October 8, 1980, citing his back problems as the reason.

Subsequently, on January 16, 1981, appellant filed a petition for reinstatement of his compensation against Edgar, as well as a new claim for compensation against Esten. On the latter claim he alleged that the continuous bending and lifting resulted in nerve entrapment and/or aggravation of the pre-existing back injury.

Counsel for Edgar again made a discovery request for all relevant medical information. However, in response to this request, appellant's counsel included the previously suppressed report from Dr. Casanova, which stated in relevant part:

"I have treated Mr. Phillips for lumbar sacral spasms and problems with the right sciatic nerve on occasions over the past ten years so it is impossible for me to either determine or give you an honest opinion as to whether the accident had any relativity to Mr. Phillips claim."

At the bottom of this report was the handwritten notation: "Do not sent to ins. co. (sic) lawyer." This notation had been placed there by appellant's counsel.

36

Counsel for Edgar thereupon filed a petition for review, alleging that appellant was not disabled due to the February, 1977, fall, and that the notice of compensation and two supplemental agreements had been secured by fraud and/or misrepresentation. This petition for review was consolidated for hearing purposes with the two claim petitions filed by appellant.

During the course of the hearings regarding these consolidated petitions testimony of appellant's treating neurosurgeon, Dr. Robert M. Jaeger, was again introduced. However, this time Dr. Jaeger was presented with the report from Dr. Casanova, which he had never previously seen, and asked whether the prior condition would have affected his original diagnosis. That testimony developed as follows:

Q. [COUNSEL] I'm not sure in terms—as you well know, Doctor, the law makes or requests of doctors things that sometimes are tough to give, but can you say to a reasonable medical certainty now knowing what you have been told today and never knew before, that the facet syndrome that you diagnosed was caused by this fall? Are you still able to do that, Doctor, to a reasonable degree of medical certainty knowing about the prior ten year back problems that Mr. Phillips at least indicated—at least Dr. Casanova indicates that he had?

A. [DR. JAEGER] I think that one can conclude from this that there has been pain for a prolonged period of time and that there was an event that influenced this for the worse, but one cannot be precise that this is the only cause.

Q. [COUNSEL] Might he be disabled today, Doctor, based upon his chronic back condition as opposed to the fall that he had in February 1977?

A. [DR. JAEGER] I don't think that's the sole cause.

Q. [COUNSEL] Which?

A. [DR. JAEGER] The fall in 1977.

Q. [COUNSEL] As a matter of fact, Doctor, is it even possible for you to say that that is a contributing cause

knowing now that he had a chronic back problem ten years prior to this?

A. [DR. JAEGER] It could be a contributing cause.

Q. [COUNSEL] Could be but is there any way to say to a reasonable degree of medical certainty that it was?

A. [DR. JAEGER] Only in the context what was related at the time when this seemed to be the distressing event.

Q. [COUNSEL] I'm not sure—is that a yes or a no?

A. [DR. JAEGER] Since he gave me this history in 1978 and that seemed to be his description at the time, I can't go back and understand the discrepancy.

Dr. Jaeger also testified that appellant had never revealed his relationship with Dr. Casanova, and that he, Dr. Jaeger, had taken at face value appellant's representation that his only prior back condition was a "backache eight or ten years ago prior to [Dr. Jaeger's] interview of him on January 17, 1978." Dr. Jaeger further testified that appellant had not registered any complaints regarding any new injuries, although he did have continuing pain from the condition which the doctor had previously diagnosed.

Based on this evidence and the testimony of appellees' doctor, who testified that appellant's condition was not a result either of his 1977 fall or of his work in the Esten factory, the referee found that appellant's original compensation agreement was void as having been induced by fraud, and that appellant had not produced sufficient competent evidence to establish his respective disability claims. Consequently, he denied appellant's requests for relief and granted Edgar's petition for review. These orders were affirmed by the Workmen's Compensation Appeal Board, as well as by the Commonwealth Court. Petitioner then sought allowance of appeal, which was granted. We also affirm.

■ The threshold question in this case is whether the willful concealment of relevant medical evidence should result in the voiding of a previously entered compensation agreement. The answer to this question must be a definite yes.

Section 422 of the Workmen's Compensation Act provides in pertinent part:

Where an employer shall have furnished surgical and medical services or hospitalization in accordance with the provisions of subsection (f) of section 306, or where the employe (sic) has himself procured them, the employer or employe (sic) shall, upon request, in any pending proceeding, be furnished with, or have made available, a true and complete record of the medical and surgical services and hospital treatment, including x-rays, laboratory tests, and all other medical and surgical data in the possession or under the control of the party requested to furnish or make available such data.

77 P.S. § 835.[1] The section is clearly mandatory and admits of no exceptions.

In this case it is undisputed that appellant, at least through the actions of his counsel, violated this section. Although the Act contains no explicit remedy for such a violation, it does provide:

A referee of the department may, at any time, review and modify or set aside a notice of compensation payable and an original or supplemental agreement or upon petition filed by either party with the department, or in the course of the proceedings under any petition pending before such referee, if it be proved that such notice of compensation payable or agreement was in any material respect incorrect.

77 P.S. § 771.[2] In *Barna v. Workmen's Compensation Appeal Board*, 513 Pa. 518, 522 A.2d 22 (1987), we stated that this section applies to "an agreement or notice of compensation payable which provides for payment for a disability which is not work-related at its onset." *Id.*, 513 Pa. at 521, 522 A.2d at 23–24.

In the present case the nature of the violation was so egregious as to taint the compensation agreement and to legitimately call into question whether appellant's disability

1. Act of Feb. 8, 1972, P.L. 25, No. 12, § 3.
2. Act of March 29, P.L. 159, No. 61, § 23.

was work-related. The only remedy which could effectively rectify the situation was to return the parties to where they would have been had no violation occurred. This is precisely what was accomplished by the referee's order nullifying the original compensation agreement and the supplemental agreements.

Appellant attempts to bring this case within this Court's prior decision in *Beissel v. Workmen's Compensation Appeal Board*, 502 Pa. 178, 465 A.2d 969 (1983), wherein we held that an employer may not relitigate a previously agreed to notice of compensation where the employer "had an opportunity to, and in fact did, investigate the cause of disability." *Id.*, 502 Pa. at 183, 465 A.2d at 971. However, the facts of *Beissel* involved an employer's attempt to utilize new evidence, *generated after* the notice of compensation had been entered into, in order to call into question the original finding of disability. Significantly, in *Beissel* there was no statutory violation on the part of the claimant, and there was no allegation that the claimant had in any way impeded the normal avenues of investigation which were open to the employer. The relevant evidence in *Beissel* did not exist at the time of the compensation agreement, yet it could have been generated by the employer through normal case preparation. Thus, the two cases are in no way similar.

Therefore, since appellant's counsel's actions constituted a clear violation of the Act's mandate, and the result of said violation called into question the legitimacy of the original notice of compensation, the referee was absolutely correct in declaring said agreement null and void. Consequently, the orders affirming that decision should likewise be affirmed.

Our inquiry, however, is not at an end. Even though the compensation agreement has been voided appellant would still be entitled to compensation for the February, 1977, fall if the evidence supported his claim.[3] However,

3. Resolution of this issue in a manner favorable to Edgar renders moot appellant's issue regarding the competing burdens in an action

the evidence does not. Appellant's medical evidence consisted of Dr. Jaeger's testimony, which became considerably less confident after Dr. Jaeger was presented evidence of appellant's pre-existing condition. On the other hand, appellees presented the testimony of Dr. Richard Finnesson, who testified without hesitation that appellant's condition was not caused by the fall from the ladder. This testimony was accepted by the referee and formed the basis for the decision to deny benefits. We detect no error with this decision.

■ Appellant's only remaining issue concerns his claim against Esten. However, the record in this case is woefully inadequate to support this claim. Appellant's own witness testified that he had no evidence of a new injury and that the symptoms throughout this period were consistent with the condition exhibited by appellant prior to working for Esten. Consequently, appellant's claim against Esten was properly denied.

FLAHERTY and ZAPPALA, JJ., join in this opinion.

## OPINION IN SUPPORT OF REVERSAL

NIX, Chief Justice.

I agree with Mr. Justice Papadakos that there is insufficient evidence upon which to conclude that appellant, in failing to apprise Dr. Jaeger of his prior chiropractic treatment from Dr. Casanova, intended to defraud his former employer, Edgar Construction Company. It is evident that, as Mr. Justice Papadakos has demonstrated, appellant provided Dr. Jaeger with sufficient information regarding his medical history so as to preclude the conclusion that he intended to defraud his former employer. The substantial burden of proof regarding fraudulent conduct on the part of

to reinstate benefits as opposed to an action to lift a suspension of benefits. The effect of the referee's order was to place appellant in the same position as any first time claimant. Consequently, the burden was on appellant at all times to demonstrate causation between his injury and his claimed disability. *See Lewis v. Workmen's Compensation Appeal Board,* 508 Pa. 360, 498 A.2d 800 (1985).

appellant, as enunciated by this Court in *Thomas v. Seaman*, 451 Pa. 347, 304 A.2d 134 (1973), has not been met.

Since there was an insufficient basis upon which to void the initial award *ab initio*, the referee was incorrect in placing the burden on appellant to demonstrate his entitlement to reinstatement of benefits. Rather, the burden should have been placed on appellee, pursuant to section 413 of the Workmen's Compensation Act, 77 P.S. § 772.[1]

Appellant returned to work for several months after the accident. While his original claim against Edgar was pending, he secured alternative employment with Esten which he was physically capable of performing. Upon being notified that his truck driving services were no longer needed, appellant accepted another position with the company which he knew would cause him pain. It was only until the pain entirely precluded him from working that appellant discontinued working and sought reinstatement of benefits.

Thus, appellant is essentially asserting that his 1980 back injury is attributable to the 1977 incident. Since in my view the original compensation agreement was valid, the burden rested with Edgar to demonstrate that appellant's loss of earnings were not attributable to the disability on account of the injury. *See* section 413 of the Act, 77 P.S. § 772. *See also, Weidner v. Workmen's Compensation Appeal Board*, 497 Pa. 516, 522 n. 3, 442 A.2d 242, 245 n. 3 (1982). Appellant had been entitled to disability benefits from Edgar since the 1977 injury and witnessed a benefit suspension only because of his willingness to earn his living rather than collect disability benefits. To now require appellant to carry the burden of proof in the reinstatement proceeding would not only run afoul of the remedial purposes of the

1. Section 413 in relevant part states:
   [W]here compensation has been suspended because the employe's earnings are equal to or in excess of his wages prior to the injury that payments under the agreement or award may be resumed at any time during the period for which compensation for partial disability is payable, *unless it be shown that the loss in earnings does not result from the disability due to the injury.* [Emphasis added.]

42

Act, but would also encourage malingering rather than alacrity.

I therefore dissent.

PAPADAKOS, J., joins in this opinion.

## OPINION IN SUPPORT OF REVERSAL

PAPADAKOS, Justice.

I agree that there is insufficient evidence on the record of an intent to defraud on the part of the Appellant at the time of the award against Edgar Construction Company. For this reason, the referee should not have been permitted to re-open the settled claim for compensation. To allow such reconsideration under the facts of this case will allow additional vices to creep into an area of the law which already suffers from being stuck in its own legal prickly thicket.

Fraud is the dominant issue to be resolved by this appeal. In this jurisdiction, "fraud is composed of a misrepresentation fraudulently uttered with the intent to induce the action undertaken in reliance upon it, to the damage of its victim.... To sustain the conclusion of the court below, evidence of appellant's fraud must be clear, precise and convincing." *Thomas v. Seaman*, 451 Pa. 347, 304 A.2d 134 (1973) (citations omitted). Also see, *Edelson v. Bernstein*, 382 Pa. 392, 115 A.2d 382 (1955). "Moreover, fraud or intent to defraud is never presumed, and must be proved by evidence that is clear, precise and convincing." *Carlson v. Sherwood*, 416 Pa. 286, 206 A.2d 19 (1965). Also see, *Sterling Electric and Furnace Co. v. Peterson*, 409 Pa. 435, 187 A.2d 285 (1963).

In short, this case is about the existence of fraud as a *matter of law*. As such, it requires legal proof of a "clear, precise, and convincing" nature. I have concluded that those in support of affirmance have mistakenly substituted their own morality for the judgment of law. By considering the non-disclosure of the Casanova letter with its notation in isolation, without reference to other contrary evidence as

noted herein, they simply indulge their moral indignation without accomplishing the appointed task of deciding cases under the law. In these circumstances, the decision in support of affirmance is unacceptable. It is astonishing to note that nowhere do my colleagues recognize the existence of competing evidence which must be thrown into the legal calculus in order to determine the element of intent to defraud under a clear and convincing standard of proof. In view of the testimony cited below, is it enough to find legal intent to defraud on the basis *alone* of non-disclosure of the Casanova letter? I conclude that it does not as a matter of law.

Intent to defraud is inferred from the acts of the claimant. The Appellant's act of non-disclosure of prior treatment by Dr. Richard Casanova was insufficient *alone* under the clear and the convincing standard of our law to prove *intent to defraud an insurer in a later proceeding.* This conclusion derives from the fact that, indeed, he had told his treating physician, Dr. Richard Jaeger, of prior treatment by a Dr. Zapp, and that Dr. Zapp had so informed Dr. Jaeger in writing of a "fractured L–1 vertebra."

Dr. Jaeger's pertinent testimony, noticeably absent from the majority opinion, is as follows:

Q. Do I take it, Doctor, that Mr. Phillips told you that his first problem with lumbrosacral area or low back pain began after the fall in February of 1977?

A. May I ask you a question? The question you just said—

Q. Should I repeat it?

A. Yes, if you would.

Q. Let me ask it this way: Did Mr. Phillips indicate to you that this was the first time he had problems with his lumbrosacral area, low back pain, that was after the fall in February, 1977?

A. Not precisely. He had a backache eight or ten years ago and had been treated by Doctor Zapp at that

44

time. That was part of the history on that very first occasion.

Q. Okay, go ahead.

A. Then the fall from the ladder, February of '77, with the succeeding events.

Q. Do I understand, Doctor, given in terms of what you relied upon, that is the history given to you by Mr. Phillips, was that he had back pain once eight or nine years ago and then did not have any until February of 1977, after he fell off the ladder?

A. More or less he related that he had been troubled with intermittent backaches and recalled having had a backache eight or ten years ago prior to my interview of him on January 17, 1978.

Q. What I'm trying to get at, Doctor, is that last time that he had told you that he had any back complaints was I'm talking about prior to February of 1977, would have been when, Doctor?

A. Probably eight or ten years prior, from what I interpret this.

*     *     *     *     *     *

Q. I'm going to show you, Doctor, a copy of a letter of September 28, 1978, that you wrote to Mr. Wallitsch. I'm quite sure you have a copy of that letter. In that letter do you refer to any prior history and to prior congenital back conditions?

A. (Witness now reading document) Can you ask that question again, please?

Q. In reading that letter, you do refer to knowledge of a prior congenital back condition, do you not?

A. Oh, yes.

Q. So when you wrote that letter, you knew that there was some form of a history of a back condition, am I correct?

A. All right, I think that relates to a letter.

Q. From Doctor Zapp I believe.

A. Yes, from Doctor Zapp in the subsequent year and talking about a fractured L–1 vertebra and a congenital weakness of the sacrum. I did not feel that had any bearing upon any of the complaints.

In effect, Appellant engaged in two acts: admittedly he did not tell Dr. Jaeger of Dr. Casanova's treatment, but he did reveal previous treatment by Dr. Zapp which actually involved a bone fracture rather than mere backaches as the majority suggests. This aggregate evidence was in front of the referee, and the crucial failing in this case is that it does not appear on the record that the referee took any account of the Appellant's admissions to Dr. Jaeger. Notwithstanding the non-disclosure of prior treatment by Dr. Casanova, the referee had independent evidence through Dr. Jaeger's testimony that the Appellant had informed his treating physician of a prior fracture. In view of this conflicting evidence on the issue of intent to defraud, I find insufficient basis under our law of fraud requiring clear and convincing evidence to support the referee's re-opening of the original award. To use the vernacular, I believe the majority has made a mountain out of a molehill to justify its denial of benefits to which Appellant is entitled because of work-related injuries. I fear the majority has opened the door to a malpractice suit.

LARSEN, J., joins in this opinion.